Robert E. Currie and Mickey Currie v. Commissioner.
Currie v. Commissioner
Docket No. 1294-67.
United States Tax Court
T.C. Memo 1969-4; 1969 Tax Ct. Memo LEXIS 293; 28 T.C.M. (CCH) 12; T.C.M. (RIA) 69004; January 7, 1969, filed *293 Facts: Petitioner, a physician, resided on a ten-acre farm on which he raised dogs and ponies, and grew an apple orchard. Held: Petitioner has not met his burden of proving that he was in the trade or business of raising the dogs or ponies. Hence, his expenses are not deductible under section 162, I.R.C. 1954, nor are his losses deductible under section 165, I.R.C. 1954. Held, further: Petitioner 13 has proven that he was in the trade or business of growing an apple orchard; hence, his expenses and losses therefrom are deductible. Bernard S. Kubale, 152 W. Wisconsin, Milwaukee, Wis., for *294 the petitioners. Lawrence G. Becker, for the respondent. IRWIN
Memorandum Findings of Fact and Opinion IRWIN, Judge: The respondent determined deficiencies in petitioners' income taxes for the taxable years 1962, 1963, and 1964 in the amounts of $1,480.37, $2,113.86, and $1,787.23, respectively. Since petitioners did not assign error in their petition or at trial to certain deductions and credits disallowed by the respondent, the sole issue remaining for our decision is whether petitioners carried on the trades or businesses of raising ponies and dogs or growing an apple orchard, thereby entitling them to deduct from their Federal income tax the expenses and losses incurred in the operation thereof. Findings of Fact Some of the facts have been stipulated, and the stipulation of facts, together with the exhibits attached thereto, is hereby incorporated by this reference. Robert E. Currie (hereinafter petitioner) and Mickey Currie, husband and wife, [1] were residents of Kenosha County, Wis., on the date they filed their petition in this proceeding. They timely filed joint Federal income tax returns for the calendar years involved herein with the district director *295 of internal revenue at Milwaukee, Wis. Petitioner is a physician. He was an undergraduate student at Marquette University in engineering and pre-med and received a degree in medicine from the University of Colorado. Upon completing his internship at Boston, he joined the Army and was assigned as a medical officer with the 11th Airborne Division at Fort Campbell, Ky. From there he became a general practitioner in a number of places before spending three years in such practice in Menomonee Falls, Wis. At that point he decided that he was not satisfied with general practice and would become an anesthesiologist. In order to do so, he began a residency of two years at the Veteran's Administration Hospital in Los Angeles, Calif. The major reason petitioner went to Los Angeles for this advanced training was to enable him to do outside work to supplement his residency pay. Petitioner was married at that time and has been married for 23 years. His three children at the time of trial (February 7, 1968) were 12, 16 and 21 years old. Upon completing his residency in Los Angeles, petitioner accepted staff positions *296 at two Kenosha hospitals and moved to the Kenosha area with his family. However, because of the great demand for his medical specialty, petitioner could have gone many other places and he in fact investigated several other areas of the country, but he came back to Kenosha primarily because his father-in-law was there and was ill. When petitioner came to Kenosha in 1960 there were no full-time anesthesiologists, but there were two anesthetists. An anesthesiologist is a physician who specializes in the field of anesthesiology after receiving advanced training in this field for an extended period. An anesthetist, on the other hand, is simply a person who administers anesthetics. He (or she) does not have to be a physician and, therefore, the training in the field is not nearly as extensive as that of an anesthesiologist. Although petitioner is now practicing at St. Luke's Hospital in Racine, Wis., there are at least 3 full-time anesthesiologists in Kenosha as compared to only one, petitioner, several years earlier. In August 1965, petitioner relocated his practice in Racine although he and his family did not physically move way from the farm that he purchased in 1960. When he first *297 arrived in Kenosha, as the only Board-eligible anesthesiologist in the area, petitioner was on call by two hospitals 24 hours per day every day. On occasion he would be required to spend all night at the hospital due to emergency surgery. Petitioner knew that he was stepping into a virgin field in Kenosha and this was what he wanted. He felt he would enjoy organizing a department of anesthesiology along the lines that he thought it should be. He eventually did organize such a department at St. Catherine's Hospital in Kenosha where he headed the anesthesia and intensive care departments. Petitioner more or less gravitated into these positions as the departments were developed. Initially petitioner was in attendance on 40-50 patients per month. The average 14 anesthesiologist wants to have about 65 patients per month. Petitioner's load now is much heavier than that. In 1962 and 1963 petitioner had approximately 60-70 patients per month but in the slack months might have only 40. The number of hours petitioner spent practicing medicine each week varied since the number of emergencies that petitioner was called upon to assist in varied. Petitioner was not called on every emergency. *298 Prior to each operation for which he administered an anesthetic, it was necessary for petitioner, in order to determine the necessary anesthetic and dosage, to evaluate the patient's medical history, determine the patient's anxieties, and examine the patient in order to determine his blood pressure, and the strength of his heart and lungs. It was also necessary for petitioner as an anesthesiologist to examine the patient during his post-operative care in order to be sure that the effect of the anesthetic administered had properly dissipated. Petitioner tries to spend about one and one-half hours per day reading professional material but sometimes finds that difficult to do. He would like to spend much more time reading than he now does. In 1961-63 the pressure for reading was not as great because petitioner did not intend to take his Boards right away. In the fall of 1960 petitioner purchased the farm on which he now lives on a land contract for $42,500 with a personal note for a down payment, because he did not have cash sufficient for a down payment. While petitioner's prospects were bright, he had no savings and was in debt. Petitioner's home and its grounds, with an assessed *299 value of $30,000 to $35,000, occupy approximately two acres of the total acreage of approximately 10 acres. The farm is roughly rectangular, is three miles south of the Kenosha city limits, and is on the only hilly land in the area. At the time of purchase there was a two-car garage as well as dilapidated chicken coop and tool shed on the premises. Since the purchase, petitioner rebuilt the tool shed into a barn, converted the chicken coop into a kennel, put in a grape arbor, planted about 600 cranberry and evergreen trees as windbreaks, as well as some apple trees of which he had about 800 in early 1968. Petitioner himself did much of the work in converting the tool shed and chicken coop. The aggregate cost of all of these improvements was $5,000 or more. Petitioner received professional fees in the amount of $5,581.57 in his first three months of practice in Kenosha County in the latter part of 1960. Dogs Petitioner decided to raise dogs in 1960 about the time the farm was purchased. In the fall of the following year he bought an old English mastiff, which was examined by petitioner before he purchased it. The dog had a gastric defect, a common inherited defect in this breed. *300 Petitioner selected this dog, which was a male, because he was familiar with this breed. He knew their weaknesses; when he was in general practice in Menomonee Falls, Wis., he had owned a mastiff but he had to get rid of that dog because many people in that city were afraid of it. While petitioner in 1961 also attempted to purchase a female mastiff, he did not do so because either the prices were too high or there were none in stock within a reasonable distance. He realized at the time he purchased the male mastiff that a female might be hard to purchase and that he might even have to import one from Great Britain. Petitioner loved the male mastiff. However, this dog had several defects - it was lame because petitioner tripped over it and it died of the gastric defect. After his experience with the mastiff, petitioner considered several other breeds. Petitioner purchased an adult female dog of the breed known as Bouvier des Flanders. This dog was kennel-shy and suffered from severe mental disturbances. The veterinarian recommended that it be destroyed which petitioner did in 1963. Petitioner then decided upon raising rottweilers, a relatively unknown breed, particularly in Wisconsin. *301 He sought and received information on this breed's qualities, both physical and commercial, before making this decision. In 1962 petitioner bought a stud (male) rottweiler for $150 and a bitch (female) rottweiler for $200. Petitioner bought a second bitch rottweiler in 1963. Rottweilers are large dogs. The male that petitioner had until about a week before the trial weighed 150-160 pounds. The stud rottweiler purchased by petitioner in 1962 was entered and shown at the International Kennel Club Show in Chicago in April 1964. The dog came in second in the show in spite of the fact that it was car sick from the automobile ride to Chicago. At this time petitioner had a 15 professional handler for this dog. The dog was not shown after 1964 because petitioner felt it would be too expensive to hire a professional handler to take the dog around the country. The first litter of rottweiler pups was born in February 1964, more than two years after petitioner first acquired the rottweilers. The reason for the interim between the date of purchase and date of birth was to allow for the maturity of the brood bitch. When petitioner bought the rottweilers in 1962, he was aware that he would *302 have to wait for a long period before breeding the dogs. Petitioner knew when the bitch was expected to give birth; however, he was out for two to three hours during that night and when he returned she had lain on two or three of the pups. Another one was alive but had brain damage and was destroyed by petitioner. Hence, of the 10 pups in the litter, only 6 survived. A veterinarian was not called to supervise the birth because petitioner felt that he could do as well as a veterinarian. Although the number of pups in a litter of rottweilers varies, in some areas it is specified that they be limited to a maximum of 5-6 and all above that number must be destroyed. Petitioner had been advised that there was a potential market for rottweilers in Wisconsin. Since he did not own a "name" kennel, petitioners believed that he could and would have to sell the pups for $150 each, which he considered to be a very low price. However, even though petitioner advertised in Dog World magazine (four times between March and September 1964), the Chicago Tribune (for eight days in May and June 1964), and the Kenosha News (for six days in May 1964), he found that there was virtually no market for this *303 breed. When petitioner's efforts to sell the six surviving pups in the litter met with no success, five were given away generally to people with whom petitioner was neither related nor closely acquainted. When these five pups were given away they were about half grown although petitioner at trial did not recall exactly how old they were at that time. Petitioner would not have given them away but for the fact that these dogs, which weighed 40-50 pounds each, resided in cramped quarters, were very messy and difficult to feed and were generally expensive and difficult to take care of. The remaining pup was kept by petitioner primarily as a watchdog since the area in which petitioner and his family reside is relatively unprotected by the police or sheriff's department. Petitioner believed that he needed a minimum of two dogs on his property to protect his family. The last pup was finally sold, however, in 1965 to a Chicago merchant who was in need of a guard dog. A rottweiler makes an excellent guard dog as well as a good family dog. While the dog was sold for only $100, without papers, petitioner believed that a reasonable price for the dog with papers would have been $250. The dog *304 was sold for $100 because the purchaser was not willing to pay any more and petitioner liked the purchaser and his family. Without papers the purchaser cannot officially breed the dog. The second rottweiler female which was purchased by petitioner in 1963 was accidentally bred in February 1965 when one of petitioner's children let the male out while she was in heat. She had been kept out of the kennel to protect her. The litter that was the result of this accidental breeding was given away after they were weaned to Lambs, Inc., (hereinafter referred to as Lambs) a nonprofit charitable organization which facilitated the training of retarded and spastic children. The bitch that was the mother of this litter was also given to Lambs. Lambs owned several pet shops in the Chicago area where these children take care of the animals. Petitioner had altruistic motives in giving the pups to Lambs. Petitioner's kennel did not have a name. Although petitioner recognized that it was customary to incorporate the name of the kennel into the name of the pups born at that kennel, he did not think that this was mandatory and the pups in this litter were not so named. The pups in the first litter *305 were named by petitioner's children since petitioner kept them for some time. The names were not registered with the American Kennel Club. Petitioner was a member of an organization called the Medallion Rottweiler Club. Although he received the weekly newsletter of the organization, he had never attended any of its monthly meetings. It was petitioner's understanding that the membership of the organization was not restricted to breeders of rottweilers. In 1962 and 1963 petitioner had no knowledge of the provision in the Wisconsin statutes which required the licensing of dog kennels. Nor did petitioner make any request to any board or agency of the county concerning the use of his property and 16 whether or not it conformed to the zoning ordinance. As this ordinance applied to Pleasant Prairie Township of which petitioner was a resident during the years before the Court, they failed to provide for a dog kennel as a permitted use on petitioner's property which is zoned as agricultural and commercial. This ordinance, however, does provide the machinery by which petitioner might have applied for a permit to operate a dog kennel on his property as a variance, but he did not do so. *306 Petitioner did not think that it was necessary to obtain a permit to raise dogs on farmland. Ponies In 1961, after attending several horse shows, talking to a few breeders and watching the papers, petitioner purchased three Shetland ponies from a local breeder - a stallion for which he paid approximately $250 and a mare and colt for which he paid a total of approximately $150. These ponies were purchased at the peak of the market. A foal was born to the mare in 1961 but it died at birth, at which no veterinarian was present. A second foal was born to the mare in 1962 but it was killed by three of petitioner's rottweilers which were "packing"; petitioner had allowed the dogs to run free at night. The mare also gave birth to a third foal in 1963. It was sold along with the mare for $150 in 1964 to a Kenosha tile setter who had done favors for petitioner. The petitioner also purchased a Shetland mare in 1963 which shortly thereafter, when it made its way through the fence surrounding petitioner's property, was killed by an automobile on the highway fronting petitioner's property. The colt and stallion purchased in 1961 were donated to Lambs. In the years before the Court there *307 were several breeders in Kenosha County who raised and sold scrub ponies which were much easier to break to saddle-and-bridle or harness-and-cart than were the wellbred stock owned by petitioner. These scrub ponies sold for $35-$40, considerably less than the $150 petitioner felt that his foals were worth. This differential reduced any potential market for petitioner's ponies. Petitioner advertised one or more ponies for sale in the Kenosha News (for six days in May 1964) and in the Chicago Tribune (for three days in May and June 1964). He also advertised by communications with friends and casual acquaintances. Petitioner owned horses as a child. He was raised in Wyoming and Montana and spent much of his summer riding horses. During the first two or three years after purchasing the farm, petitioner grew timothy and alfalfa which was used to help feed the ponies. However, later petitioner could not find anyone to cut and bale his hay and then, after a drought in the area, it became almost impossible to buy any hay. Petitioner had one saddle. Both he and his oldest daughter could and did ride the stallion. Petitioner also had a harness cart on which his children rode with his help. *308 There was no sign on petitioner's mailbox or anywhere on his property which in any way indicated the sale of dogs or ponies by petitioner. Nor does the record show that petitioner at any time had a sign indicating the sale of apples. Because of the traffic by the farm to the Chicago area, petitioner's wife was fearful of the attention that such signs might attract. Petitioner's farm did not have a name. Apple Orchard Petitioner, in the spring of 1961, began planting potted apple trees purchased from a nursery as well as dry stock in the form of whips, both of which would not produce a growth of apples for many years. In that year a total of approximately 600 apple trees were planted on approximately seven of the ten acres acquired by petitioner the previous year. At present he has approximately 800 apple trees. Petitioner contacted and consulted with the county agricultural agent, an agricultural agent from the University of Wisconsin, as well as the Thompson Brothers, orchard growers in Kenosha County, and the Stark Brothers in Louisiana, Mo., an apple tree nursery. The work that has to be done in order to establish and maintain the orchard includes planting of new trees, clearing *309 of alfalfa in order that the nursery stock could grow, spraying and mulching, and otherwise protecting against rabbit and rodent damage. The only record of expenditures and receipts concerning the ponies, dogs and orchard kept by petitioner was a notation on the stub of each check drawn. However, petitioner had purchased from Dog World magazine a "breeder's book" which is a combination account book and litter record book. Petitioner has had several hobbies over the years. One of his present hobbies is building model railroads with his son. As a 17 child he collected stamps but discontinued this hobby when he lost interest in it. Petitioner, during the taxable years at issue, spent up to 40 hours per week during the active season in connection with his dogs, ponies, and apple orchard. During the winter time, the off-season, petitioner spent up to 20 hours per week in connection with these activities. In addition to a high school boy who worked for petitioner during the summers, petitioner's wife and children were also of some assistance to him on the farm. Petitioner's income tax returns [2] for the taxable years at issue show net income from his profession as a physician *310 to be $24,144.01 $26,295.75, and $30,739.82, for the taxable years 1962, 1963 and 1964, respectively. [3] The returns also show net taxable income for these years to be $12,686.40, $15,564.28, and $19,331.52, respectively. Petitioner's alleged farm losses [4] of $4,779.16, $6,196.66 and $4,869.76, for the taxable years 1962, 1963 and 1964, respectively, constitute part of the difference between petitioner's reported net income from his profession and his reported net taxable income. Petitioner's records for the taxable years at issue indicate an allocation between the alleged dog and pony ventures on the one hand and the orchard venture on the other as follows. [5]
Dogs and Ponies
Apple Orchard
1962
$2,054.69
$2,724.47
1963
3,098.62
3,098.04
1964
2,650.25
2,219.51
*311 Petitioner's accountant prepared a financial statement for petitioner which showed that as of December 31, 1964, petitioner had total assets with a book value of $57,922.11 and total liabilities of $44,551.95. In computing his total assets, however, petitioner's accountant indicated that petitioner had a negative cash balance on hand and in banks of - $897.90. Petitioner's accountant felt that petitioner was spending too much money on his farm operations and advised him to curtail his expenditures on his dogs and ponies. This advice was rendered by the accountant without regard to whether or not petitioner's activities with his dogs and ponies constituted businesses. Opinion During the taxable years 1962, 1963 and 1964 at issue herein, petitioner, a physician, raised dogs and ponies and cultivated an apple orchard. Petitioner made expenditures on and sustained losses annually from these activities and has deducted these amounts on his income tax returns for the years in issue. However, in order for us to sustain the deductibility of these amounts, petitioner has the burden of proving that his activities were conducted by him as a trade or business. [6]Rule 32, Tax Court Rules *312 of Practice. Thus, the only issue before us is whether any or all of these three activities constitute a trade or business within the meaning of Code [7]sections 162[8] and 165. [9]
*313 The parties have cited many cases involving questions of the kind here involved. These cases substantially agree on the broad principles to be applied. In order for us to allow the claimed losses, petitioner must 18 establish that he was engaged in the business of raising and breeding dogs, raising and breeding ponies, and growing an apple orchard, with a genuine intent of making a profit from each activity. Margit Sigray Bessenyey, 45 T.C. 261 (1965), affd. 379 F. 2d 252 (C.A. 2, 1967); Henry P. White 23 T.C. 90 (1954); Norton L. Smith, 9 T.C. 1150 (1947). Should he fail to prove that any one or more of the activities do not constitute a trade or business, this would not preclude our finding that the remaining activity or activities constitute a trade or business. Hence, petitioner has a separate burden of proof as to each activity. While petitioner, in order to prevail with regard to a particular activity, must prove that he conducted that activity with the genuine intent of making a profit therefrom, this profit motive need not be reasonable but must only be bona fide. Margit Sigray Bessenyey, supra.The *314 fact that only losses were incurred to date is not inconsistent with a profit motive. Margit Sigray Bessenyey, supra; Morton v. Commissioner 174 F. 2d 302 (C.A. 2, 1949), affirming a Memorandum Opinion of this Court, certiorari denied, 338 U.S. 828 (1949); Hirsch v. Commissioner, 315 F. 2d 731 (C.A. 9, 1963), affirming a Memorandum Opinion of this Court Whether or not petitioner had the proper profit motive, is a question of fact that can only be determined from an examination of all of the evidence. United States v. Pyne, 313 U.S. 127 (1941); Morton v. Commissioner, supra; Frederick A. Purdy, 12 T.C. 888 (1949). Although petitioner was a very frank and candid witness, it must be remembered that his uncontradicted but self-serving testimony as to his intent is not to be persuasive if it should appear improbable in light of other proven circumstances. Army Times Sales Co., 35 T.C. 688 (1961). If any of these activities were conducted as a hobby or for recreation, the losses and expenses incurred therefrom are not deductible. Theodore Sabelis, 37 T.C. 1058 (1962); *315 Israel O. Blake, 33 B.T.A. 1457 (1938). However, in order for us to hold for the respondent, it is not necessary for us to decide that petitioner's activities constitute recreation or hobbies. Since petitioner has the burden of proof, respondent will prevail if petitioner has failed to show that these activities were conducted as a trade or business. While the record fails to show any one fact of sufficient persuasiveness one way or the other, we think the record taken as a whole clearly indicates that petitioner has failed to carry his burden with respect to dogs and ponies but has carried it with respect to the apple orchard. Dogs and Ponies While we recognize that neither petitioner's actions nor his intent need be reasonable, and that he could prevail with an unreasonable but bona fide intent of making a profit on his dogs and ponies throughout the taxable years at issue, Margit Sigray Bessenyey, supra, we believe the weight of the evidence presented militates against such a finding. The major evidence in his favor is his testimony that he had a profit-making motive, and while we were impressed with his straightforward and candid manner in general, *316 most of the evidence is contra to this testimony. Since petitioner has the burden of proof, respondent necessarily must prevail if petitioner fails to meet his burden. From the time petitioner moved to Kenosha he had little time to develop businesses separate and apart from his professional occupation as a physician. Initially he was in attendance on 40 to 50 patients per month which is about two-thirds the maximum number most anesthesiologists would desire to have. However, he was on emergency call for two hospitals 24 hours per day and in about a year his patient load was approximating 60-70 patients per month. When petitioner began practicing in the Kenosha area he wanted to organize a department of anesthesiology in one of the hospitals and eventually did organize such a department. In addition he wanted to spend more time than he actually had reading professional medical literature. From this evidence we find it difficult to believe that petitioner had the time to seriously embark on profit-making ventures of raising dogs and ponies. While he, on occasion, may have spent up to 40 hours per week on the farm, we feel that petitioner primarily used this time for relaxation in view *317 of the demands upon his professional time. Of course, our finding that petitioner used this time mainly for relaxation does not preclude us from finding that he also had a profit-making motive, but it does make it more difficult for us to find such a motive. And, as we have stated, our examination of the record as a whole fails to indicate a profit-making motive as to the dogs and ponies. 19 Petitioner nevertheless contends that he engaged in these activities to raise additional income since he believed his income from his medical profession was insufficient. We find this difficult to accept. In the first place petitioner's taxable income in the latter part of 1960, before he allegedly began the other "businesses," was sufficiently high that it should have indicated to him that he would soon have an "adequate" income. Furthermore, his taxable income for the taxable years at issue, while admittedly not showing petitioner to be a wealthy man, does not, on the other hand, indicate that he was in need. Secondly, even if petitioner were in need of additional income, it would not seem logical for him to embark on ventures that would not show any return for some years hence. The record *318 quite clearly shows that at the time he embarked on these ventures petitioner had no expectation of profit therefrom for at least several years, that is until about the time that he would be "cashing in" upon his training in anesthesiology. Thirdly, we believe that a prudent man in financial need would have followed a course opposite that of petitioner herein; that is, he would not make expenditures on speculative ventures that could at best only show a long-term profit unless he derived personal satisfaction directly or indirectly from these expenditures. We believe this to be the case herein. Furthermore, petitioner's activities with regard to both the dogs and ponies in toto indicate that he did not operate with the intent to conduct a trade or business. Petitioner had a life-long interest in both dogs and horses and derived considerable pleasure from both. As a child in Montana and Wyoming petitioner did much horseback riding and he had dogs as pets for many years. This factor alone does not preclude him from being in a trade or business; indeed, his familiarity with them could be motivating factors for embarking on business ventures. But we believe that the history of petitioner's *319 enjoyment from these animals raises a presumption under the circumstances of this case that he was not in the trade or business of raising them. That is, a greater amount of proof is required than would be necessary if he had not previously enjoyed these animals as pets. With regard to the mastiff, petitioner indicated that while he examined the dog before he purchased it, he knew at that time that the dog had a gastric defect which eventually proved fatal. We believe that a prudent dog breeder would generally not wish to breed a dog with such a defect. Furthermore, the only evidence which might prove that petitioner took steps to breed this dog was his self-serving statement that he attempted to purchase a female mastiff but was unsuccessful in in finding one at a reasonable price and/or distance. Petitioner stated, "I loved the dog, * * * the mastiff" and he had owned a mastiff as a pet when he was in practice in Menomonee Falls. Again, these factors alone do not necessarily prove that petitioner was not in the trade or business of raising mastiffs, but this among other facts set forth leads us to that conclusion since he has presented very little persuasive evidence indicating *320 that he was in such a trade or business. As to the Bouvier des Flanders which petitioner owned before he purchased the rottweilers, petitioner presented virtually no evidence whatsoever regarding a trade or business intent. And again because he has failed in his burden of proof, we can only conclude that he was not in the trade or business of raising this dog either. It is with regard to the rottweilers that he has presented the greatest amount of evidence. But we again feel he has failed to prove that he was in the trade or business of raising this breed. When petitioner purchased the rottweilers he purchased a breed which was essentially unknown in the country and for which there was virtually no market in the Wisconsin area. While petitioner testified that he was advised that he could sell these dogs in Wisconsin, we do not feel this testimony is persuasive, particularly in view of petitioner's failure to establish some sort of demand for this breed, at least in the Kenosha area. Petitioner had no sign on his farm which in any way designated petitioner as a breeder of rottweilers. Nor does the record indicate that he ever attempted to show or advertise his dogs prior to the *321 time the first litter of pups was born. Petitioner did not follow the custom of including the name of the breeder's farm in the name given to the dogs. While petitioner knew that this helps to establish the reputation of a breeder, he did not do so. He had not even given a name to his "farm." Nor were the names of these dogs registered with the Amercian Kennel Club. Petitioner also recognized the effectiveness of rottweilers as guard dogs and used them as such. While one could be in the trade or business of raising dogs and at the same time use these dogs for protection, such use is by itself indicative of a non profit motive. Other evidence, not 20 available here, is then necessary to indicate a profit motive. Furthermore, petitioner's allowing the dogs to have the run of the property had unfortunate consequences. One of petitioner's ponies was killed as a result of the dogs "packing" and the second bitch rottweiler was accidentally bred. While this is not inconsistent with raising dogs as guard dogs, it does seem inconsistent with a trade or business since the latter usually necessitates a greater degree of care than demonstrated by petitioner herein in attempting to avoid *322 such mishaps. We find further inconsistencies with the existence of a trade or business of raising dogs in petitioner's failure to determine the legal restrictions or privileges which might apply to him as a breeder of dogs. He was not aware of the provision of the Wisconsin statutes providing for the licensing of dog kennels. Nor had he inquired as to how his property is zoned and if his intended business of a dog kennel was a permitted use on his property. Petitioner's property is zoned as agricultural and commercial and dog kennels are not a permitted use unless a variance is applied for under the ordinance, which petitioner did not do. However, this factor is not as important as the fact petitioner was not even aware of nor did he inquire as to what these restrictions might be. When confronted with this evidence at trial petitioner's only response was that he did not think it was necessary to get a permit to raise dogs on farm land. We believe that this evidence further supports our conclusion that petitioner was not seriously thinking about a commercial venture. Petitioner contends that the fact that he advertised for sale some of the rottweiler pups indicates that he was *323 in the business of selling rottweilers. We disagree. Practically everyone has on occasion attempted to sell an item of furniture, clothing, an automobile, etc. Like petitioner herein, such isolated attempts to sell do not, without much more, constitute a trade or business. As it turned out, petitioner's advertising in this case did not result in sales but were mere offers to sell. Five of the six pups were not sold but were given away when petitioner found that his advertising brought virtually no response. Petitioner testified that he gave them away because they resided in cramped quarters, were messy, difficult to feed and expensive. It appears that if petitioner were actually in the trade or business of raising dogs, he should have foreseen these eventualities and would have planned accordingly. Although petitioner eventually sold the remaining rottweiler for $100, this was, according to his own testimony, practically a "giveaway" price. We find the following testimony of petitioner particularly indicative of his nonprofit motives in owning dogs: Q. Doctor, have you ever had a hobby? A. All the time. Q. Could you tell me, tell the Court what some were? A. Right now, it's *324 building H O railroads with my son. Q. Did you have a hobby which you have discontinued? A. I collected stamps when I was in the fifth grade which I discontinued it. Q. Why did you discontinue collecting stamps, Doctor? A. Cause I didn't like it. Q. Lost interest in it? A. Um hum, but I haven't lost interest in dogs by the fact I've got three of them now. It is interesting to note that petitioner was not asked if he owned dogs as a hobby, but volunteered this information when talking about other hobbies. This is practically tantamount to an admission (as is the fact that petitioner owned at least one rottweiler until just before trial, some two years after he "went out of business") that petitioner was not in the trade or business of raising rottweilers, but to the contrary, owned and raised them primarily for personal satisfaction. We, therefore, agree with respondent's contention that on balance petitioner's personal enjoyment of dogs, his need for guard dogs, and his lack of businesslike efforts in certain aspects of the planning, conducting and supervising the dog-raising activities, together with the other factors mentioned above and in the record, minimizes the *325 evidentiary value of his proffered intention of profit in the dog-raising activities. Our conclusion is the same regarding petitioner's alleged business of raising ponies and much of the discussion above is also applicable to this activity. As with the dogs, petitioner did not attempt to become identified in his area as a raiser of ponies. His "stables" and his farm had no name; there was no sign on his property identifying his farm as one at which ponies could be purchased; he did not enter the ponies 21 in shows. We believe that a prudent raiser of ponies would take more positive steps toward publicizing his business than petitioner herein has taken. Petitioner purchased his ponies at the height of the market and ostensibly planned to raise and sell them in an area which was already inundated by breeders of ponies which were more easily bred, cheaper to raise and more easily trained than petitioner's ponies. Consequently, these ponies could be disposed of at a lower price and more readily than the breed of ponies owned by petitioner. While petitioner on brief argues that the availability of the cheaper scrub ponies eliminated his market only after he had decided to raise *326 ponies for profit, it seems reasonable to us to conclude that a more thorough investigation of the potential market at the time petitioner entered the alleged business would have demonstrated to petitioner that it would be very difficult for this venture to be profit making. The record indicates that petitioner never had more than two or three ponies including foal at any one time during the taxable years in question. While a small scale operation is not necessarily indicative that an activity does not constitute a trade or business, it is one of the many factors that we consider. This can also be said of petitioner's dog-raising activities. Other factors which we have considered in our holding that petitioner was not in the trade or business of raising ponies includes what seems to us to be petitioner's failure to exercise sufficient care to protect the first foal which was dead at birth, as well as the second foal which was killed by petitioner's rottweilers and the second mare which was killed by an automobile. The only record of expenditures and receipts concerning the ponies as well as the dogs was a notation on the stub of each check drawn. This is a further indication *327 that petitioner did not exercise the effort one normally would who is engaging in a profit-making undertaking. Another factor which again is not controlling but which militates against his proffered intention of profit making is the fact that petitionr derived personal pleasure from the ponies. Petitioner had a saddle, harness and cart which he and his children, sometimes with his help, used to ride or work the ponies. While not inconsistent with a profit motive, the presence of personal satisfaction requires counterbalancing evidence that this satisfaction was not the primary motive for embarking on this venture. Although petitioner did sell the original mare and the third foal in 1964 for a total of $150 after advertising in Kenosha and Chicago newspapers, this, as we have discussed with reference to the rottweilers, is certainly not in and of itself indicative of a profit-making motive. Apple Orchard Of the three activities that petitioner alleges were separate businesses, he presented the least evidence with regard to the apple orchard. However, we feel that petitioner has adequately sustained his burden of proof with regard to this issue. While he was advised by his accountant *328 in 1964 to discontinue raising dogs and ponies. he continued to grow apple trees until, at the date of trial, he had approximately 800 apple trees. The very magnitude of this operation seems to suggest a business operation for, as petitioner points out, there is nothing aesthetic or pleasant about thousands of decaying apples on a 10-acre farm. Furthermore, apple trees do not, unlike dogs and ponies, provide the recreation which is generally associated with a hobby. While, as respondent contends, the trees may have had some aesthetic value, we believe this to be incidental. Respondent's main thrust seems to be that there is no evidence before the Court that petitioner had any sales of apples and that the record failed to indicate any evidence of harvesting, storage and commercial distribution of the apples. We do not find this persuasive. While we have carefully considered respondent's argument, we might have been inclined to give more weight to it if the record had shown that there were no sales of apples over a longer period of time. It could well be that if apples were not sold or even raised during the taxable years at issue, that this was due to the fact that the trees were *329 not yet mature. Although petitioner had ample opportunity on reply brief to mention this or in any other way to counter respondent's argument, he failed to do so. We nevertheless believe, for the reasons stated, that petitioner has fulfilled his burden of proof by demonstrating that he intended to eventually make a profit from the sale of apples. The conclusion that a profit motive is lacking does not necessarily follow from the fact that losses may have been sustained for a period of years; this is only one fact to be considered along with others. Margit Sigray Bessenyey, 22 Morton v. Commissioner, and Hirsch v. Commissioner, all supra. While respondent questions petitioner's allocations of his farm losses between the dogs and ponies on the one hand and the apple orchard on the other, we are inclined to agree with the petitioner's allocation. In the first place, respondent gives no reason whatsoever as to why he disputes the petitioner's allocations. Secondly, respondent does not at any time question the substantiation of any of petitioner's farm expenditures. He disputes only petitioner's contention that petitioner had a profit-making motive with regard to each of these three *330 activities; he does not dispute the amounts expended by petitioner. Finding no reason to question the petitioner's allocation, we, therefore, accept it as correct. Since we hold that petitioner was in the trade or business of growing an apple orchard, he will be allowed to deduct his losses and expenses incurred thereon in 1962, 1963, and 1964. However, since we hold that petitioner was not in the trade or business of raising either dogs or ponies during the taxable years at issue, we disallow his claimed losses and expenses thereon. Decision will be entered under Rule 50. Footnotes
1. The wife is a party only because she signed a joint income tax return.↩
2. All references to petitioner's 1962 income tax return refer to his amended return for that year. ↩
3. During each of these years, petitioner included $3,600 as salary to his wife in his total professional expenses which were deducted from his gross professional receipts to arrive at his net income from his profession. However, a corresponding amount of $3,600 was included elsewhere on petitioner's joint income tax return as salary to Mrs. Currie for each of the taxable years at issue. ↩
4. These amounts constitute cash expenditures plus depreciation on all three of petitioner's alleged businesses at issue herein. ↩
5. The loss on dogs and ponies in each taxable year plus the loss on the apple orchard for the same taxable years when totaled equals the alleged farm losses as stated above. It should be noted, however, that petitioner's accountant testified that the loss on dogs and ponies in 1964 was $2,800.25. It is apparent from an examination of the exhibits and other evidence that this figure did not take into account the $150 received that year from the sale of two ponies. When reduced accordingly the loss on dogs and ponies plus the loss on the apple orchard total $4,869.76 for 1964, the same amount as stated above.↩
6. Petitioner does not contend that section 212, Expenses for Production of Income, is applicable. We, therefore, do not consider whether the standard need be only that petitioner prove that he engaged in these operations with the intention of making a profit. See Margit Sigray Bessenyey 45 T.C. 261, 273↩ (1965). 7. All statutory references are to the Internal Revenue Code of 1954. ↩
8. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * * ↩
9. SEC. 165. LOSSES. (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * * (c) Limitation on Losses of Individuals. - In the case of an individual, the deduction under subsection (a) shall be limited to - (1) losses incurred in a trade or business; (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business * * *↩